## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| PASTOR RICHARD MARTINEZ, JOCELYN RANGEL, and RONI-NICOLE FACEN | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 20 CV 06252 |
| CITY OF CHICAGO, CHICAGO DEPARTMENT OF PUBLIC HEALTH, MAYOR LORI LIGHTFOOT, ALLISON ARWADY, COMMISSIONER OF THE CHICAGO DEPARTMENT OF PUBLIC HEALTH, | ) ) ) ) ) ) ) | |
| Defendants, | ) | |

## AMENDED COMPLAINT

Plaintiffs Pastor Richard Martinez, Jocelyn Rangel, and Roni-Nicole Facen complain against Defendants, City of Chicago, Chicago Department of Public Health, Mayor Lori Lightfoot, and Commissioner Allison Arwady of the Chicago Department of Public Health, as follows:

## Introduction

1.     This action is brought to redress the harm caused by the racially-discriminatory decision by Defendants to relocate a polluting scrap metal plant on the North Side of Chicago – in the predominantly Caucasian and affluent Lincoln Park neighborhood – to the far South Side of Chicago – in the 10th Ward, which is predominantly Hispanic and African-American and less economically affluent.

2.     The move also sends the polluting scrap metal facility far away from the $6,000,000,000.00 "Lincoln Yards" development in Lincoln Park – where the City approved TIF financing for skyscrapers and luxury housing.

3.     The move sends the pollution generated by the scrap metal facility to a minority neighborhood and close to the George Washington elementary and high schools, homes, and churches of people that are already suffering from adverse air quality.

4.     Despite recognizing that "low-income, Black and Latinx communities on the South and West Sides carry a disproportionate amount" of the City's pollution burden, the Chicago Department of Public Health (CDPH) cleared the way for the scrap metal facility to increase the air pollution on the Southeast side of the City because key members of the City Council and bureaucracy were influenced by the over $750,000 General Iron spent to influence City Hall.

5.     Businesses that are not polluting the City do not need to spend three quarters of a million dollars to influence policymakers, but General Iron did.

6.     In a tale to familiar to Chicagoans, General Iron and its owners "paid-to-play" (and in this case paid-to-pollute), paying a dozen lobbyists over $690,000 and contributing over $160,000 to key Aldermen, including those overseeing Zoning and Environmental Protection.

7.     General Iron also hired former federal prosecutor Patrick Collins, who worked with Mayor Lightfoot and donated to her campaign, to work behind the scenes with City officials and push through approvals.

- 2 -

8.     Money, in Chicago, always speaks louder than the voices of Hispanic and African-American residents and that has not changed, even after an election where anti-corruption promises were made.

9.     The CDPH recognizes that pollution has contributed to social and health inequities and that these inequities are part of the high disparities in COVID-19 deaths among African-American and Hispanic residents; yet, the CDPH, under pressure from inside the City, found nothing wrong with adding to the pollution and the inequities in moving the scrap metal facility to African-American and Hispanic neighborhoods reeling from the impact of COVID-19.

10.     This case arises under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 42 U.S.C. § 1983, as a result of Defendants' racially discriminatory decision to relocate the scrap metal plant from a white neighborhood to predominantly African-American and Hispanic neighborhoods.

## Jurisdiction and Venue

11.     There is jurisdiction over the subject matter pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, the Civil Rights Act, 42 U.S.C. § 1983, 28 U.S.C. §§ 1331 and 1343(a), the Constitution of the United States.

12.     The declaratory and injunctive relief sought herein as authorized by 28 U.S.C. §§ 2201 and 2202.

13.     Venue is proper in the Northern District of Illinois, Eastern Division, under 28 U.S.C. §1391, because the acts and events giving rise to the complaint

occurred in the Northern District of Illinois, Eastern Division and because Defendants reside here.

## Parties

14.     Plaintiff Pastor Richard Martinez is the Pastor of Nehemiah Family Fellowship Church on South Avenue C in Chicago, Illinois.

15.     Pastor Martinez resides at and owns the property on South Avenue C, within a short distance from 11600 South Burley.

16.     Plaintiff Jocelyn Rangel resides on South Avenue C in Chicago, Illinois and within a short distance from 11600 South Burley.

17.     Plaintiff Roni-Nicole Facen resides on South Saginaw Avenue and works on South Ewing Avenue within a short distance from 11600 South Burley.

18.     The health of Plaintiffs, their families, fellow parishioners, and neighbors will be adversely affected by the City allowing General Iron to move its operations to the South Burley location.

19.     The value and use of the property owned and leased by the Plaintiffs will be adversely affected by the City allowing General Iron to move its operations to the South Burley location.

20.     Defendant City of Chicago is and was, at all times mentioned, an Illinois municipal corporation organized and existing as such under the laws of the State of Illinois that oversees and administers programs and services in the City.

21.     Defendant Chicago Department of Public Health is a department of the City of Chicago that oversees and administers programs and services in the City of

Chicago.

22.     Defendant Mayor Lori Lightfoot is and was, at all times mentioned, a citizen of the United States residing within the jurisdiction of this Court.

23.     Defendant Mayor Lightfoot oversees departments of the City of Chicago and is charged with, among other duties, ensuring that the City's departments comply with federal laws regarding the placement and use of industrial plants that pollute in the City of Chicago.

24.     At all times mentioned, Defendant Mayor Lightfoot was acting under color of state law and within the scope of her employment for the City of Chicago.

25.     Defendant Mayor Lightfoot is being sued in her individual capacity.

26.     Defendant Commissioner Allison Arwady is and was, at all times mentioned, a citizen of the United States residing within the jurisdiction of this Court.

27.     Defendant Commissioner Arwady administers the Department of Public Health for the City of Chicago, and is charged with, among other duties, ensuring that the Department complies with federal laws regarding the operation and placement of industrial plants that pollute in the City of Chicago.

28.     At all times mentioned, Defendant Commissioner Arwady was acting under color of state law and within the scope of her employment for the City of Chicago.

29.     Defendant Commissioner Arwady is being sued in her individual capacity.

## Facts

30.     General Iron is a scrap metal processor and recycler with operations located at 1909 North Clifton Avenue, in the Lincoln Park neighborhood of Chicago.

31.     General Iron operates through a number of related entities and assumed names, including General Metals, LLC, GII, LLC, General III, LLC, General Iron Holdings, and General Iron Industries (collectively "General Iron").

32.     The Lincoln Park neighborhood surrounding General Iron is majority Caucasian, with the most recent census data showing that 84.6% of the residents are Caucasian, 4.0% are African-American, and 6.1% are Hispanic.

33.     Lincoln Park is also one of the most affluent neighborhoods within the City of Chicago, with numerous white professionals residing there and high-end shopping located throughout.

34.     General Iron's operations produce air pollution that affects the air quality and health of residents in the surrounding area and Lincoln Park neighborhood.

35.     Residents of Lincoln Park regularly complain of air pollution caused by "fluff" or "fugitive dust" that General Iron produces in the process of scrap metal recycling, which coats sidewalks, roads, porches, and playgrounds.  (**Exhibit 1**, Table of General Iron Public Health Complaints; **Exhibit 2**, List of Violations Hearings; **Exhibit 3**, Photo Sheffield & Poe Air Filter; **Exhibit 4**, Email Concerned Mother to CDPH.)

36.     This "fluff," "fugitive dust," or "fugitive particulate matter" is made up of metal particles and is not safe for people or animals to ingest or breath.

37.     The recycler also contributes to air pollution through the smoke it produces by cutting metal with torches, through dust created by moving around metal and other components, and from the diesel emissions from high volume of large trucks that enter and leave the facility at extended hours of operation. (**Exhibit 5**, Line of Trucks Idling.)

38.     In 2006 and 2012, General Iron agreed to two settlements with the United States Environmental Protection Agency (EPA), involving its refrigerant recovery program and fugitive dust escaping the facility.

39.     Despite the promises in those settlements to prevent the escape of emissions, General Iron continued to emit toxic materials into the air.

40.     In July 2018, the EPA again cited General Iron for violations of the Clean Air Act.  (**Exhibit 6**, 7/18/2018 EPA Notice and Finding of Violations.)

41.     The EPA described the emissions by General Iron were "volatile organic matter" (VOMs) and listed General Iron as a "major source" of such emissions.  (*Id*.)

42.     The EPA found that the VOMs emitted by General Iron are "photochemical oxidants associated with a number of detrimental health effects, which include birth defects and cancer, as well environmental and ecological effects."  (*Id*.)

43. The EPA further found that the VOMs emitted by General Iron can create a "photochemical smog," react with oxygen in the air, and create ozone, which contributes to a variety of health problems including "chest pain, coughing, throat irritation, and congestion," and worsen "bronchitis, emphysema, and asthma," and decrease lung function. (*Id.*)

44. The EPA also found that the "fluff," "fugitive dust," or "fugitive particulate matter" emitted by General Iron contains microscopic particles that "can get deep into the lungs and cause serious health problems" including difficulty breathing and decreased lung function. (*Id.*)

45. The harmful effects of the emissions described by the EPA were even inadvertently confirmed by a City inspector, who described the emission from General Iron as having a "pungent odor of sweet metal that burned [her][] nostrils." (**Exhibit 7**, 12/18/2019 Inspection Violation and Tickets.)

46. The emissions from General Iron were repeatedly documented as having blown into the surrounding neighborhood and over a mile from the scrap metal facility. (*Id.*)

47. The "fugitive dust" emitted by General Iron would coat vehicles, sidewalks, and buildings in the surrounding area. (*Id.*)

48. Members of the Lincoln Park community made complaints about the emissions from General Iron to different departments within the City of Chicago, including the CDPH, the Illinois Environmental Protection Agency, and the U.S. Environmental Protection Agency.

49.     Residents near the General Iron site in Lincoln Park lodged complaints multiple times per week about emissions from General Iron, describing General Iron as "emitting horrible noxious gases." (*See* Exhibits 1 and 2.)

50.     The emissions by General Iron would force residents to close windows and direct children to play indoors.

51.     In December 2019, a City inspector found that "untreated emissions" continued to be released into the air by General Iron and that General Iron was making absolutely no effort to contain or mitigate those emissions. (*See* Exhibit 7.)

52.     Despite the continued and repeated violations, the City still refused to act against General Iron and General Iron continued to operate by emitting harmful chemicals.

53.     The City of Chicago actively worked against the community to deflect the complaints because General Iron generously contributed to political campaigns of key elected City officials, and hired influencers that had insider relationships with other City officials. (**Exhibit 8**, GI Lobbyist Disclosure 2016-Present.)

54.     An explosion at the General Iron site in May 2020 finally forced the City's hand when the explosion rallied even more residents against the danger posed by General Iron's continued emissions. (*See* **Exhibit 9**, Photos Smoke and Fire Trucks.)

55.     General Iron's conduct should have resulted in serious violations and the suspension and revocation of its permits, as the City had revoked other permits of other businesses that committed less serious infractions.

56. City officials, instead, actively worked to help General Iron re-start operations and the emission of harmful chemicals into the air, even as the City was closing other businesses due to COVID-19.

57. General Iron, a polluter contributing to reduced air quality and breathing problems, was allowed to operate during the COVID-19 health crisis affecting lung function.

58. City officials worked to keep General Iron operating, in part, because the City wanted General Iron to move away from the surrounding area that had been rezoned re-developed into a mixed-use project called "Lincoln Yards," which will include upscale living and retail. (*See* **Exhibit 10**, Emails of City and General Iron Coordinating Narrative on Move; **Exhibit 11**, Email City and Sterling Bay.)

### General Iron Pays to Pollute

59. Despite all the increased scrutiny from the community and complaints, General Iron continued to violate its permits and emit toxic chemicals into the air in late 2019 and throughout 2020.

60. General Iron was able to operate with impunity because they engaged lobbyists and spent over $750,000 to sway City leaders. General Iron's owners and lobbyists made strategic contributions to City Council Chairs ($62,250 for Zoning Chair Tom Tunney, $41,750 for Environmental Protection Chair George Cardenas, $30,500 for Finance Chair Scott Waguespack, and $24,500 for Ethics Chair Michele

Smith) and various other politicians.[1]  (**Exhibit 12**, General Iron Political Contributions.)

61.    General Iron's facility is located in the 2nd Ward, and not in the wards of Aldermen Tunney, Waguespack, Smith, or Cardenas.

62.    The Alderman of the 2nd Ward, Brian Hopkins, made repeated efforts to hold General Iron accountable for the pollution and restrict General Iron's operations (which was allowed to operate for more hours than any other such industrial facility).  (**Exhibit 13**, Hopkins Ltr. Summarizing General Iron Health Hazards.)

63.    Each time Alderman Hopkins attempted to introduce legislation related to General Iron, Mayoral staff and the Council Chairs would block the legislation.

64.    For example, when Alderman Hopkins sought to reduce General Iron's hours of operations and the volume of trucks coming and going from the site, City officials worked to prevent that legislation from ever seeing the light of day or reaching the City Council floor.  (**Exhibit 14,** Email about blocking Hopkins.)

65.    When residents of Lincoln Park organized meetings and circulated health information about General Iron's impact on air quality, City officials drafted releases for CDPH to oppose the health concerns of the residents.   (**Exhibit 15**, Email CDPH Letter Editing.)

---

[1] Figure includes contributions to the "Ward Committees" related to the Alderman.

66. The Commissioner of CDPH submitted draft statements about General Iron to City officials for re-writing and revision, and even told City officials that they would need to "get to" the Chancellor of the University of Illinois at Chicago if they wanted to intimidate and block researchers that were assisting the residents in studying the emissions from General Iron. (*Id*.; **Exhibit 16**, CDPH Email about UIC Study; **Exhibit 17**, Email with Mayor's Office Writing CDPH Response.)

67. General Iron also hired former federal prosecutor Patrick Collins (who worked with Mayor Lightfoot at the U.S. Attorney's Office and donated to her campaign), to work with City officials to block any effort to restrict General Iron's operations and facilitate the move from Lincoln Park to the East Side.

68. Pat Collins and lobbyist Victor Reyes, unlike members of the communities, were able to gain private access to highest-level City officials and hold personal meetings with City officials to push General Iron's agenda. (**Exhibit 18**, Emails of Collins meeting with City Department Heads; **Exhibit 19**, Emails of Reyes meeting with City Officials.)

69. Rather than expose the corruption of allowing a private entity special treatment to pollute the air, the new Mayoral administration deflected the media and placated residents about the health effects of General Iron's operations, redirecting the focus to the impending move and closure of the Lincoln Park site.

### The Move to the South Side

70. The City of Chicago worked to relocate General Iron's pollution of the Lincoln Park neighborhood to 11600 South Burley Avenue, Chicago, Illinois in the

"East Side" neighborhood, and adjacent to the Cottage Grove Heights, Jeffery Manor, Trumbull Park, and South Deering neighborhoods in Chicago's 10th Ward.

71.　On September 10, 2019, the City of Chicago had entered into a "term sheet" agreement with General Iron and an entity known as RMG Investment Group, LLC,[2] that allowed General Iron to continue to operate in Lincoln Park until December 31, 2020, in return for moving the operations to the less valuable South Side of the City.  (**Exhibit 20**, 9/10/2019 Term Sheet.)

72.　The South Burley location is on the Southeast side of the City, in the Tenth Ward, and that area is a majority-minority, with the most recent census data showing that 55.80% of residents are African-American and 37.7% are Hispanic.

73.　General Iron and Reserve Management Group (RMG) plan to operate a scrap metal processing operation on South Burley Avenue using the equipment, personnel, and assets currently located at General Iron's Lincoln Park facility.

74.　General Iron and Reserve Management Group are connected to one another through revenue sharing agreements and common ownership.

75.　Although Reserve Management Group is purported to be the operators of the South Burley Avenue facility, representatives of General Iron told the City that General Iron was investing in the South Burley Avenue facility, and no permits have been issued in the name of RMG for the South Burley operations.  (**Exhibit 21**, Email about GI operating facility.)

---

[2] The only RMG Investment Group, LLC registered to do business in Illinois was dissolved in 2012.

76.    General Iron also updated the registrations for its entities to list their principal offices as 11600 South Burley Avenue, Chicago, Illinois, 60617.

77.    Moreover, General Iron's equipment, personnel, and machinery are moving from the Lincoln Park site to the South Burley location, including the machinery that is most critical to General Iron's Lincoln Park operations.

78.    The City of Chicago found that General III, LLC "would assume General Iron's business activities" and that General Iron's equipment would be relocated from Lincoln Park to South Burley.  (**Exhibit 22**, ZBA Findings, pg. 1.)

79.    In additional, General Iron representative and vice president of operations for the Lincoln Park site, Adam Labkon, testified that "he would oversee management of the Applicant's proposed metal shredder" at the South Burley location.  (*Id*. pg. 3.)

80.    The September 10th agreement that facilitated the moment from white Lincoln Park to the minority 10th Ward, was made outside of the City of Chicago's regular approval process and was made with the knowledge that minority residents of the 10th Ward would not be effective in blocking the move.

81.    The September 10th term sheet agreement requires the City of Chicago to cooperate and assist General Iron/RMG in approving whatever permitting or licensing General Iron/RMG needs to operate at the South Burley site.

82.    The City of Chicago, including the Department of Public Health, Mayor Lightfoot and Commissioner Arwady have made every effort to clear any obstacles to moving General Iron to South Burley.

83.     General Iron applied for a special use permit for the South Burley facility to allow for more extensive uses than were already allowed, and a zoning variance to allow heavy diesel truck traffic.

84.     The City of Chicago Zoning Board of Appeals (ZBA) was required to consider and make specific findings of fact on the effect of the possible changes, including by considering nuisance complaints.

85.     The ZBA, which is controlled by the City officials that General Iron had already influenced with contributions and lobbyists, credited only the conclusory statements presented by General Iron, refused to hear or consider testimony from opposing experts and witnesses, ignored the half-dozen pre-existing nuisance complaints about the South Burley site, and found the pollution generated would somehow benefit the neighborhood.

86.     Contrary to the ZBA's conclusions, both CDPH and the Illinois EPA had received complaints against RMG's existing South Burley operations for fugitive dust in 2019; the same type of complaint lodged against General Iron's Lincoln Park facility.  (**Exhibit 23**, Table South Burley Violations & Complaints.)

87.     Consistent with the September 10th agreement, the ZBA violated Illinois law and its own procedures and approved the zoning permit and variance for the South Burley operations.

88.     The actual zoning and variance permit, upon information and belief, has not yet been issued by the City.

89.    The City is imminently prepared to issue that zoning and variance permit, if it has not already.

90.    The scrap metal facility on South Burley cannot operate without the City and CDPH issuing two additional permits:  (a) to allow the facility to emit air pollution; and (b) to operate the scrap metal recycling plant.

91.    Again, consistent with the City's obligations under the September 10th agreement to clear the way for General Iron to operate on South Burley, the CDPH, without any public notice, surreptitiously issued an air pollution control permit after 5 PM on September 30th.  (**Exhibit 24**, GI Air Pollution Control Permit.)

92.    An air pollution control permit is not issued to business that do not emit air pollution; instead, an air pollution control permit is issued to allow a business to emit air pollution.

93.    Because the South Burley operations will emit air pollution, like the Lincoln Park operations, an air pollution control permit was essential to allow General Iron/RMG to again emit fugitive dust and pollution into the air.

94.    To allow the actual operation of the scrap metal facility on South Burley, the City Department of Buildings must still issue a recycling permit.

95.    The City is imminently preparing to issue that permit, upon information and belief, to avoid public scrutiny and fulfill the City's obligations under the September 10th agreement.

96.    The City abdicated its responsibility to protect the residents of the East Side, Cottage Grove Heights, Jeffery Manor, Trumbull Park, and South

Deering neighborhoods in Chicago's 10th Ward from harmful emissions by agreeing to move General Iron's polluting operations from Lincoln Park.

97.    Both the EPA and the CDPH determined that General Iron's operations in Lincoln Park emitted pollution into the air in violation of the law and existing permits.

98.    The EPA determined that General Iron's emissions were harmful if inhaled or ingested, and health experts confirmed that the emissions by General Iron are harmful if inhaled or ingested.

99.    Despite all of this information, City officials worked to relocate a toxic polluter from a largely white neighborhood to a minority neighborhood, which furthers the systemic segregation in Chicago.

100.    The City of Chicago has a long history of using zoning and planning to segregate and isolate minority residents.

101.    The City of Chicago also has a pattern of agreeing to place or expand industrial uses near or adjacent to minority neighborhoods.

102.    The 2020 City of Chicago Air Quality Report found that "structural racism and economic hardship" make "it more likely for [people of color] to live in polluted communities," and that pollution hot spots are already concentrated in predominantly African-American and Latino neighborhoods on the South and West sides of the City.

103. Despite the already low air quality on the South Side, the City, in furtherance of the racially discriminatory pattern extending back decades, agreed to move General Iron's operations to South Burley.

## Impact of the South Burley Facility

104. The prevailing winds in the area of the South Burley site generally blow from the Southwest to the Northeast, meaning that emissions from the site will blow toward the George Washington Elementary School, George Washington High School, and the surrounding residential East Side neighborhood, and nearby Jeffery Manor, Trumbull Park, and Cottage Grove Heights.

105. Pastor Martinez and his family live on South Avenue C in the East Side neighborhood and are approximately 1.2 miles away from 11600 South Burley Avenue, and that location is directly in the path of the potential airflow from the South Burley operations.

106. Pastor Martinez is a 48-year-old person of Hispanic dissent, and the majority of his congregation is also Hispanic, and reside near the Church.

107. Like many members of the Southeast Side community, Pastor Martinez's family members have pre-existing health conditions.

108. Jocelyn Rangel is of Hispanic dissent and lives on South Avenue C, in the East Side neighborhood, 1.28 miles away from 11600 South Burley Avenue, Chicago, Illinois, and within the path of the potential airflow from the South Burley operations.

109.   Roni-Nicole Facen is a Hispanic and African-American woman who works at a school on South Ewing Avenue, approximately 2.07 miles from 11600 South Burley Avenue, in the East Side neighborhood, lives on South Saginaw Avenue, approximately 3.8 miles from 11600 South Burley Avenue, and within the path of the potential airflow from the South Burley operations.

110.   Plaintiffs are susceptible to additional health conditions created by air pollution, and are more susceptible, according to the CDPH and the Illinois Department of Public Health to COVID-19 exposure as a result of air pollution in the community.

111.   Air pollution most seriously affects people with asthma, lung disease, cardiovascular disease, pregnant woman, elderly people, and children.

112.   Children are highly vulnerable to the damaging effects of air pollution because their lungs are still growing and developing, their immune and metabolic systems are still developing, they suffer from frequent respiratory infections, and they are more active outdoors than adults and therefore breathe in higher doses of outdoor pollutant.

113.   African-Americans are more likely to suffer from cardiovascular disease, and are three times more likely to die of asthma than white people.

114.   COVID-19 has a higher morbidity rate among African-Americans and Hispanics due to preexisting cardiovascular and breathing issues, which are often created by the air quality in the minority neighborhoods.

115.    The City has purported to close businesses and the entire lakefront to prevent the spread of COVID-19, but has refused to close General Iron or stop the opening of the South Burley site, despite the scientifically proven correlation between air pollution, health, and COVID-19.

116.    Defendants know that the air pollution released by the South Burley facility will severely impact the East Side community, including by exacerbating deaths due to COVID-19.

117.    Despite knowing that minority populations are more exposed to and more seriously affected by air pollution, the Defendants decided to facilitate the move from Lincoln Park to South Burley.

118.    Defendants also knew that the African-American and Hispanic residents of the East Side, Jeffery Manor, Trumbull Park, Cottage and Grove Heights neighborhoods are poorer and less able to contribute to political campaigns and less organized to oppose the move from Lincoln Park to South Burley.

119.    In making this decision, Defendants intentionally discriminated against the African-American and Hispanic residents of the 10th Ward by dumping a serial air polluter on a minority community already facing an air quality deficit from years of racially discriminatory practices by the City of Chicago.

## Count I

### Violation of Title VI of the Civil Rights Act of 1964
### (via 42 U.S.C. § 1983)
### (Against the City and CDPH)

120.    Each of the foregoing paragraphs are incorporated herein.

121.    Title VI of the Civil Rights Act of 1964 was implemented to enforce the guarantees of the Fourteenth Amendment of the United States Constitution, and provides in pertinent part: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

122.    Defendants the City of Chicago and the CDPH receive federal funding from various federal agencies, and must also comply with disparate impact regulations prohibiting discrimination.

123.    The City of Chicago received federal funds from almost every federal department to fund various programs, including from the U.S. Department and Urban Development, the U.S. Department of Transportation, the U.S. Department of Education, and the Department of Public Health.

124.    The CDPH receives federal funds related to the monitoring of air quality and air pollution, and receives and administers grant funds from numerous federal agencies, including from the U.S. Department of Housing and Urban Development, to promote the health and welfare of minority communities.

125.    Most recently, the CDPH received federally funded COVID-19 stimulus to promote the health and welfare of those affected by COVID-19.

126.    In 2020, the Defendants decided to move the scrap metal plant from the predominantly white neighborhood of Lincoln Park, to the predominantly

African-American and Hispanic neighborhood on the Southeast side and grant all the permits necessary for that facility to emit pollution into the air.

127. Plaintiffs, who live in a predominately minority neighborhood on the Southeast side, will be harmed by the City of Chicago's and CDPH's racially discriminatory decision.

128. Plaintiffs are intended beneficiaries of the federal funds distributed to the City and CDPH to address health issues in minority communities and air quality issues, including the COVID-19 funds, earmarked to combat the health effects of pollution, poverty, and the virus.

129. Defendants know that the scrap metal plant is a major polluter in the City, that the metal particles produced by the operations cause respiratory and related health problems for those who live near the facility, and that low-income and communities of color are disproportionately burdened by air pollution.

130. Defendants decision to relocate the scrap metal plant from Lincoln Park to the majority African-American and Hispanic neighborhood of the East Side will injure Plaintiffs and constituted an act of intentional race discrimination in violation of Title VI of the Civil Rights Act of 1964, and the regulations promulgated to ensure compliance with the Act.

131. Defendants know that by moving the scrap metal plant from the majority white neighborhood of Lincoln Park to the majority minority neighborhood of the East Side will cause a disparate impact on African-American and Hispanic

people because they will be exposed to air pollution in the form of "fugitive dust," smoke, and fumes that the white residents of Lincoln Park will not.

132.    Defendants know about the City of Chicago's history of discrimination "making it more likely for [people of color] to live in polluted communities."

133.    Defendants also know that "communities of color are disproportionately impacted by air pollution," and that "[a]ir pollution can both increase the risk of chronic illnesses like heart and lung disease and contribute to worse outcomes for people living with certain health conditions."

134.    In addition, Defendants know that the area surrounding the South Burley facility has the residents most vulnerable to air pollution in the City, while also already having the highest level of several airborne toxic heavy metals in the entire State of Illinois.

135.    Finally, Defendants know that there is a "nine-year life expectancy gap between African-American and white residents, that that gap is due, at least in part, to the exposure of African-American residents to significantly more pollution.

136.    Despite all this, the Defendants continue to locate polluting industrial businesses in minority communities because those business contribute heavily to key City officials' campaigns.

137.    In furtherance of the racist policies of locating polluters in minority communities, Defendants reached an agreement with General Iron/ RMG outside the regular decision-making processes of the City, and delegated health, safety, and welfare responsibilities for the South Burley location to General Iron/RMG.

138.   Defendants know that the scrap metal plant will release harmful air pollution into the community surrounding based on the numerous air-quality and pollution complaints from residents of the Lincoln Park neighborhood surrounding General Iron, the violations the EPA found about General Iron's pollution and the dangers that represents, the continuing and willful violations of all pollution mitigation by General Iron, including explosions that occurred at the scrap facility, and the fact that the equipment producing emissions is moving to the South Burley location.

139.   The Defendants have, acting under the color of state law, subjected Plaintiffs to intentional discrimination under programs receiving federal financial assistance, on account of Plaintiffs' race, in violation of Title VI.

**WHEREFORE**, Plaintiffs pray for entry of a preliminary and permanent injunction preventing the issuance of any further permits for the operation of the South Burley location, a preliminary and permanent injunction impounding all federal funds provided to the CDPH until such time as the City and CDPH cease their racist practices, a preliminary and permanent injunction against the operation of the pollution control permit, and for entry of judgment against the Defendants along with an award of costs and attorneys' fees, and for such other and further relief as deemed warranted under the circumstances.

## Count II

**Violation of the Equal Protection Clause**
**(via 42 U.S.C. § 1983)**
**(Against All Defendants)**

140.    Each of the foregoing paragraphs are incorporated herein.

141.    The Defendants know that by moving the General Iron scrap metal facility from the majority white neighborhood of Lincoln Park to the majority African-American and Hispanic Neighborhood of East Side will cause a disparate impact on African-American and Hispanic people because they will be exposed to air pollution in the form of "fugitive dust," smoke, and diesel fumes that the white residents of Lincoln Park will not.

142.    Defendants know that the scrap metal plant is a major polluter in the City, that the metal particles produced by the operations cause respiratory and related health problems for those who live near the facility, and that low-income and communities of color are disproportionately burdened by air pollution.

143.    Defendants know that moving the scrap metal plant from the majority white neighborhood of Lincoln Park to the majority minority neighborhood of the East Side will cause a disparate impact on African-American and Hispanic people because they will be exposed to air pollution in the form of "fugitive dust," smoke, and fumes that the white residents of Lincoln Park will not.

144.    Defendants know about the City of Chicago's history of "making it more likely for [people of color] to live in polluted communities."

145.     Defendants also know that "communities of color are disproportionately impacted by air pollution," and that "[a]ir pollution can both increase the risk of chronic illnesses like heart and lung disease and contribute to worse outcomes for people living with certain health conditions."

146.     Finally, Defendants know that there is a "nine-year life expectancy gap between African-American and white residents, that that gap is due, at least in part, to the exposure of African-American residents to significantly more pollution.

147.     The City of Chicago has a long history of exposing its African-American and Hispanic residents to significantly more pollution, as the City conceded in a 2020 report – stating that intentional segregation "mak[es][] it more likely for [people of color] to live in polluted communities."

148.     The Defendants know that the agreement reached between the City and General Iron/RMG was done outside the regular decision-making processes of the City, was never approved by the City Council, and instead was made with a "term sheet" agreement.

149.     The Defendants know that the South Burley facility will release harmful air pollution into the 10th Ward community based on the numerous air-quality and pollution complaints from residents of the Lincoln Park neighborhood surrounding General Iron, the violations the EPA found about General Iron's pollution and the dangers that represents, the continuing and willful violations of all pollution mitigation by General Iron, including explosions that occurred at the

scrap facility, and the fact that the equipment producing emissions is moving to the South Burley location.

150.   The actions of all Defendants in facilitating General Irons' pollution from the majority white neighborhood of Lincoln Park to the African-American and Hispanic 10th Ward on the Southeast side, will injure Plaintiffs and will deny Plaintiffs the right to the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

**WHEREFORE**, Plaintiffs pray for entry of a preliminary and permanent injunction preventing the issuance of any further permits for the operation of the South Burley location, a preliminary and permanent injunction precluding the issuance of any other permits or licenses to allow the South Burley location to operate, a preliminary and permanent injunction against the operation of the pollution control permit, and for entry of judgment against the Defendants along with an award of costs and attorneys' fees, and for such other and further relief as deemed warranted under the circumstances.

## Count III

### Violation of the Illinois Constitution Equal Protection Clause
### (Against All Defendants)

151.   Each of the foregoing paragraphs are incorporated herein.

152.   The Defendants know that by moving the General Iron scrap metal facility from the majority white neighborhood of Lincoln Park to the majority African-American and Hispanic Neighborhood of East Side will cause a disparate impact on African-American and Hispanic people because they will be exposed to air

pollution in the form of "fugitive dust," smoke, and diesel fumes that the white residents of Lincoln Park will not.

153.    Defendants know that the scrap metal plant is a major polluter in the City, that the metal particles produced by the operations cause respiratory and related health problems for those who live near the facility, and that low-income and communities of color are disproportionately burdened by air pollution.

154.    Defendants know that by moving the scrap metal plant from the majority white neighborhood of Lincoln Park to the majority minority neighborhood of the East Side will cause a disparate impact on African-American and Hispanic people because they will be exposed to air pollution in the form of "fugitive dust," smoke, and fumes that the white residents of Lincoln Park will not.

155.    Defendants know about the City of Chicago's history of "making it more likely for [people of color] to live in polluted communities."

156.    Defendants also know that "communities of color are disproportionately impacted by air pollution," and that "[a]ir pollution can both increase the risk of chronic illnesses like heart and lung disease and contribute to worse outcomes for people living with certain health conditions."

157.    Finally, Defendants know that there is a "nine-year life expectancy gap between African-American and white residents, that that gap is due, at least in part, to the exposure of African-American residents to significantly more pollution.

158.    The City of Chicago has a long history of exposing its African-American and Hispanic residents to significantly more pollution, as the City conceded in a

2020 report – stating that intentional segregation "mak[es][] it more likely for [people of color] to live in polluted communities."

159.    The Defendants know that the agreement reached between the City and General Iron/RMG was done outside the regular decision-making processes of the City, was never approved by the City Council, and instead was made with a "term sheet" agreement.

160.    The Defendants know that the South Burley facility will release harmful air pollution into the 10th Ward community based on the numerous air-quality and pollution complaints from residents of the Lincoln Park neighborhood surrounding General Iron, the violations the EPA found about General Iron's pollution and the dangers that represents, the continuing and willful violations of all pollution mitigation by General Iron, including explosions that occurred at the scrap facility, and the fact that the equipment producing emissions is moving to the South Burley location.

161.    The actions of all Defendants in facilitating General Irons' pollution from the majority white neighborhood of Lincoln Park to the African-American and Hispanic 10th Ward on the Southeast side, will injure Plaintiffs and will deny Plaintiffs the right to the equal protection of the laws in violation of the Illinois Constitution.

**WHEREFORE**, Plaintiffs pray for entry of a preliminary and permanent injunction preventing the issuance of any further permits for the operation of the South Burley location, a preliminary and permanent injunction precluding the

issuance of any other permits or licenses to allow the South Burley location to operate, and for entry of judgment against the Defendants along with an award of costs and attorneys' fees, and for such other and further relief as deemed warranted under the circumstances.

## Count IV

### Public Nuisance
### (Against All Defendants)

162. Each of the foregoing paragraphs are incorporated herein.

163. The process of scrap metal recycling engaged in by General Iron/RMG creates "fluff," "fugitive dust," or "fugitive particulate matter" (metal particles) and emits volatile organic matter, photochemical smog, and other air pollutants.

164. The emissions by General Iron are harmful, detrimental or injurious to public health, safety or welfare of the residents in the surrounding vicinity in the 10th Ward and nearby areas.

165. General Iron was found to have repeatedly and illegally emitted VOMs into the air and depositing contaminants upon the land in such place and manner so as to create an air pollution hazard.

166. The facility proposed by General Iron/RMG on South Burley will emit the same VOMs into the air, using the same equipment from the Lincoln Park location, and harm the health, safety, and welfare of the public unless the recycling operations are prohibited.

167. The residents in the surrounding vicinity in the 10th Ward and nearby areas, including the Plaintiffs, all have a common right to be free from conduct and

conditions that create a significant risk to the public health, welfare, and safety, and to be free from conduct and conditions that create a disturbance and reasonable apprehension of danger to person and/or property.

168.    General Iron/RMG's scrap metal recycling operations set to commence on South Burley will constitute a public nuisance to the surrounding vicinity in the 10th Ward and nearby areas and will create unreasonable interference with common rights enjoyed by the general public, including the public's health, safety, peace, comfort and convenience.

169.    General Iron/RMG's proposed operations on South Burley will unreasonably interfere with common rights enjoyed by the general public in the surrounding vicinity in Chicago, and Defendants knew, or should have known, that authorization of those operations would detrimentally affect the health and safety in a continuous and long-lasting nature so as to produce a permanent, continuing, and significant effect on the rights of the public.

170.    Defendants' past and ongoing approvals of the South Burley scrap operations will produce an ongoing and continuing nuisance as the harmful pollutants produced by General Iron/RMG will cause or contribute to cause significant threats to the health and safety of the Plaintiffs and all other persons who desire to live in or near to the site and in the 10th Ward and nearby areas.

171.    Defendants have refused prevent the toxic pollution, despite repeated demands, and have deferred and delegated their authority to General Iron/RMG.

172.    Defendants' wrongful conduct, unless and until enjoined and restrained by court order, will cause great and irreparable injury to the Plaintiffs and residents in the 10th Ward and nearby areas in the form of adverse health consequences of the toxic pollution created by General Iron/RMG will occur and become worse over time.

173.    Plaintiffs and the residents surrounding areas in Chicago are without an adequate remedy at law, will be irreparably injured, and the air pollution will occur unless and until this Court grants equitable and injunctive relief.

**WHEREFORE**, Plaintiffs pray for entry of a preliminary and permanent injunction preventing the issuance of any further permits for the operation of the South Burley location, a preliminary and permanent injunction precluding the issuance of any other permits or licenses to allow the South Burley location to operate, and for entry of judgment against the Defendants along with an award of costs, and for such other and further relief as deemed warranted under the circumstances.

## Count V

### Private Nuisance
### (Against All Defendants)

174.    Each of the foregoing paragraphs are incorporated herein.

175.    The process of scrap metal recycling engaged in by General Iron/RMG creates "fluff," "fugitive dust," or "fugitive particulate matter" (metal particles) and emits volatile organic matter, photochemical smog, and other air pollutants.

176. The emissions by General Iron are harmful, detrimental or injurious to public health, safety or welfare of the residents in the surrounding vicinity in the 10th Ward and nearby areas.

177. General Iron was found to have repeatedly and illegally emitted VOMs into the air and depositing contaminants upon the land in such place and manner so as to create an air pollution hazard.

178. The exposure to General Iron/RMG's air pollution will result in the long-lasting, significant contamination of Plaintiff's properties and/or will otherwise create a continuing nuisance, which unreasonably and significantly interferes with Plaintiff's use and enjoyment of their properties.

179. The scrap yard operations on South Burley will result in the creation and release of toxic chemicals and particles into the air that will interfere with the Plaintiff's ability to freely use, and enjoy their properties, including placing limits on their ability to freely sell their respective properties, which constitutes a nuisance and/or which unreasonably and significantly interferes with the Plaintiffs' use and enjoyment of their properties.

180. Plaintiffs do not consent to the air pollution that will settle and/or migrate to or near to their properties.

181. The Defendants knew or should have known that the scrap yard operations on South Burley will result in the creation and release of toxic chemicals and particles into the air that will interfere with the Plaintiff's ability to freely use, and enjoy their properties, including placing limits on their ability to freely sell

their respective properties, which constitutes a nuisance and/or which unreasonably and significantly interferes with the Plaintiffs' use and enjoyment of their properties.

182.    The substantial and unreasonable interference with the Plaintiffs' use and enjoyment of their respective properties constitutes a continuing private nuisance for which Defendants are responsible.

183.    As a direct and proximate result of Defendants abdication of their authority and responsibilities to General Iron/RMG in the September 10th agreement, the Plaintiffs will suffer sustained economic loss, including but not limited to, lost use of property, lost profits, denial of useful and quiet enjoyment of property, and impairment of the salability of property.

184.    The nuisance that will be created and/or maintained by the Defendants authorizations could be abated, but Defendants, to date, failed and refused to enforce the law, despite having received demands to do so.

185.    Plaintiffs and the residents of the surrounding area in Chicago are without an adequate remedy at law, will be irreparably injured, and the air pollution will occur unless and until this Court grants equitable and injunctive relief.

**WHEREFORE**, Plaintiffs pray for entry of a preliminary and permanent injunction preventing the issuance of any further permits for the operation of the South Burley location, a preliminary and permanent injunction precluding the issuance of any other permits or licenses to allow the South Burley location to

operate, and for entry of judgment against the Defendants along with an award of costs, and for such other and further relief as deemed warranted under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**PLAINTIFFS PASTOR RICHARD MARTINEZ**, **JOCELYN RANGEL**, and **RONI-NICOLE FACEN**,

By:/s/Victor P. Henderson
      One of their Attorneys

Victor P. Henderson
Christopher W. Carmichael
**THE COCHRAN FIRM - CHICAGO**
140 S. Dearborn St., Suite 1020
Chicago, Illinois 60603
Tel:  (312) 262-2880
vhenderson@cochranfirm.com
ccarmichael@cochranfirm.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on **November 12, 2020**, the foregoing

**Amended Complaint** was electronically filed with the Clerk of the United States

District Court for the Northern District of Illinois by filing through the CM/ECF

system, which served a copy of the foregoing upon all CM/ECF participants and that

a copy will be mailed to Defendants as follows:

c/o City Clerk's Office
Department of Law/Service of Process
121 N. LaSalle Street - Suite 107
Chicago, IL 60602

By:/s/Christopher Carmichael