## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| PASTOR RICHARD MARTINEZ, JOCELYN RANGEL, and RONI-NICOLE FACEN, | |
| Plaintiffs, | Case No. 20-cv-6252 |
| v. | Judge Mary M. Rowland |
| CITY OF CHICAGO, CHICAGO DEPARTMENT OF PUBLIC HEALTH, MAYOR LORI LIGHTFOOT, ALLISON ARWADY, COMMISSIONER OF THE CHICAGO DEPARTMENT OF PUBLIC HEALTH, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Pastor Richard Martinez, Jocelyn Rangel, and Roni-Nicole Facen bring this action alleging that Defendants' relocation of a large recycling facility from the northside to the southeast side of Chicago is discriminatory and in violation of their rights under Title VI of the Civil Rights Act of 1964 and federal and state Equal Protection Clauses. They also bring state law nuisance claims. Plaintiffs moved for a temporary restraining order (TRO) and preliminary injunction. (Dkt. 17).[1] Now before the Court is Plaintiffs' motion for preliminary injunction. For the reasons stated below, Plaintiffs' motion [17] is denied.

---

[1] In November 2020, in light of the City's representation that the final recycling facility permit would not issue before January 11, 2021, the Court denied the motion for TRO. (Dkt. 20).

1

## STANDARD

"A preliminary injunction is an extraordinary remedy." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). The party seeking a preliminary injunction must make an initial threshold showing that: (1) it has some likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; and (3) there is no adequate remedy at law. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079 (7th Cir. 2008). *See also Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) (as to likelihood of success, noting that the "better than negligible" standard has been retired). If the moving party fails to demonstrate "any one of these three threshold requirements, [the court] must deny the injunction." *Girl Scouts of Manitou,* 549 F.3d at 1086.

If the moving party makes the initial showing, the court then balances the irreparable harm that the moving party would endure without a preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. *Id*. "This Circuit employs a sliding scale approach for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019), cert. denied sub nom. 140 S. Ct. 268, 205 L. Ed. 2d 137 (2019) (internal citations and quotations omitted). "Ultimately, the

moving party bears the burden of showing that a preliminary injunction is warranted." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

## BACKGROUND

The facts herein are taken from Plaintiffs' Amended Complaint (Dkt. 14, "Am. Compl."), Motion for Preliminary Injunction (Dkt. 17, "Mot."), and reply brief (Dkt. 57), Defendants' filings, and Southside Recycling's amicus brief in opposition to the motion. (Dkt. 37).[2] In support of their motion, Plaintiffs submitted affidavits of: Serap Erdal, Associate Professor in Environmental and Occupational Health Sciences Division, School of Public Health, at the University of Illinois at Chicago (UIC) (Dkt. 17-1, Exh. 18); Victoria Persky, M.D., Professor in Division of Epidemiology and Biostatistics, School of Public Health, at UIC (*Id.*, Exh. 19); and Plaintiffs Jocelyn Rangel (*Id.*, Exh. 22), Richard Martinez (*Id.*, Exh. 23), and Roni-Nicole Facen (*Id.*, Exh. 24).[3] The Court makes "factual determinations on the basis of a fair interpretation of the evidence before the court." *Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir. 1986). However, these findings are preliminary and "do not bind the district

---

[2] At a status hearing on February 19, 2021, having reviewed the briefing on the preliminary injunction motion, the Court stated that it was not inclined to hold an evidentiary hearing and there were no objections by the parties. (Dkt. 59). Given the voluminous evidence from sworn affidavits, exhibits, and documents submitted by the parties and amicus party the Court did not believe such a hearing was necessary. *See Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997); *Promatek Indus., LTD v. Equitrac Corp.*, 300 F.3d 808, 814 (7th Cir. 2002). The Court heard oral argument on the motion on March 8, 2021. (Dkt. 62).

[3] "Affidavits are ordinarily inadmissible at trials but they are fully admissible in summary proceedings, including preliminary-injunction proceedings.*" Ty, Inc.*, 132 F.3d at 1171.

court as the case progresses." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011).

General Iron is a scrap metal processor and recycler with operations in the Lincoln Park neighborhood of Chicago. (Mot. ¶1).[4] The Lincoln Park neighborhood is one of the most affluent neighborhoods within the City of Chicago and is majority Caucasian, with the most recent census data showing that 84.6% of the residents are Caucasian, 4.0% are African-American, and 6.1% are Hispanic. (*Id*. ¶18; Am. Compl. ¶¶32-33). Residents of Lincoln Park regularly complained of polluting emissions and fluff from General Iron's operations. (Mot. ¶6; Am. Compl. ¶35).

General Iron's Lincoln Park facility was adjacent to "Lincoln Yards," which is a $6,000,000,000 development of skyscrapers, housing units, retail storefronts, and other amenities. (Mot. ¶14). Plaintiffs allege that the City worked to relocate General Iron from Lincoln Park to 11600 South Burley Avenue, Chicago, adjacent to the Cottage Grove Heights, Jeffery Manor, Trumbull Park, and South Deering neighborhoods in Chicago's 10th Ward. (Am. Compl. ¶70). The South Burley location is on the Southeast side of the City, in an area that is a majority-minority, with the most recent census data showing that 55.80% of residents are African-American and 37.7% are Hispanic. (*Id*. ¶72; Mot. ¶18).

On September 10, 2019, the City of Chicago entered into a "term sheet" agreement with General Iron and RMG Investment Group, LLC, that allowed General Iron to

---

[4] General Iron operates through a number of related entities and assumed names, including General Metals, LLC, GII, LLC, General III, LLC, General Iron Holdings, and General Iron Industries (collectively "General Iron"). (*Id*. ¶2).

continue to operate in Lincoln Park until December 31, 2020, after which time it would move operations to the Southeast of the City. (Mot. ¶15, Exh. 1, hereafter "Term Sheet"). The Term Sheet states in part: "the City will reasonably cooperate with RMG in achieving the efficient, expeditious transition of the Business to the Southside Properties, including reasonable assistance with processing and review of license and permit applications, and scheduling of public hearings." (*Id*.). The following is a timeline of pertinent events related to permits issued to Southside Recycling[5]:

- March 2019: City's Zoning Board of Appeals (ZBA) held a hearing regarding 11600 South Burley Avenue (Dkt. 34-1, Exh. A)
- April 2019: City's Zoning Board of Appeals approved zoning variance and special use permit (Dkt. 34-5, pp.41-42 (C-9-C-10); Dkt. 17-1, Exh. 13)
- September 10, 2019: Term Sheet agreement between City and General Iron and RMG (Mot., Exh. 1)
- June 25, 2020: IEPA construction permit issued to General Iron for the South Burley location (Dkt. 34-4, Exh. D)
- September 15, 2020: CDPH air pollution control permit issued to General Iron for the South Burley location (Dkt. 14-1, Exh. 24)
- November 2020: Southside Recycling applies to CDPH for Large Recycling Facility Permit (Dkt. 34-5, Exh. E, "Recycling Permit Application")

The only remaining permit needed is CDPH's final recycling permit which has not yet been issued. On January 13, 2021, in response to a deficiency letter from CDPH, Southside Recycling submitted a supplement to its application. (Dkt. 48). In addition, before CDPH issues any final permit, a draft permit would need to be posted, triggering a 30-day public comment period. Defendants' most recent status report

---

[5] General III, LLC (d/b/a Southside Recycling) is an affiliate of Reserve Management Group ("RMG"). *See* Dkt. 34 at 5; "Recycling Permit Application" (Dkt. 34-5).

filed on March 15, 2021 indicates that no draft permit has been issued to Southside Recycling. (Dkt. 64).[6]

## ANALYSIS

Plaintiffs request a preliminary injunction prohibiting the Defendants, their agents, employees or officers, from issuing any additional permit or approval to General Iron, RMG, General III, LLC, or any related entity to operate a scrap metal recycling facility in or near the 11600 South Burley, Chicago site until after trial. In response, Defendants argue that Plaintiffs do not have Article III standing; their claims are not ripe; they have not identified any irreparable harm and have no likelihood of success on the merits of any of their legal theories. Finally, Defendants contend that the balance of harms and the public interest weigh in their favor.

### A. Standing

To establish standing a plaintiff must show it suffered an "injury in fact", a causal connection between the injury and conduct complained of, and that it is likely a favorable decision will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992) (internal citations and quotations omitted). "To assert standing for injunctive relief, a plaintiff must show that it is under an actual or imminent threat of suffering a concrete and particularized injury-in-fact; that this injury is fairly traceable to the defendant's conduct; and that it is likely that a favorable judicial decision will prevent or redress the injury." *Cook Cty., Illinois v.*

---

[6] The U.S. Department of Fair Housing and Urban Development (HUD) is investigating this matter. *Southeast Environmental Task Force et al. v. City of Chicago,* HUD File No. 05-20-0419-6/8/9. As of March 12, 2021, HUD was requesting that the City delay issuing any permit while its investigation and conciliation process "are underway." (Dkt. 65-1).

6

*Wolf*, 962 F.3d 208, 218 (7th Cir. 2020). Plaintiffs have the burden of establishing standing. *See Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) ("[plaintiff's] burden to demonstrate standing in the context of a preliminary injunction motion is 'at least as great as the burden of resisting a summary judgment motion.'") (citation omitted).

Defendants argue that Plaintiffs have not shown any imminent injury, failed to allege a causal connection between the action of the City and their speculative future harms, and have not identified any harm redressable by the Court. The Court finds that Plaintiffs have established Article III standing.

### 1. *Injury*

Plaintiffs argue that they seek to stop harmful pollution, which will impact their health and property, from a facility that will begin operations imminently, as soon as the City issues the final permit. (Dkt. 57 at 3-4). "An allegation of future injury may suffice [to establish standing] if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S. Ct. 2334, 2341 (2014) (citation omitted).

First, Plaintiffs allege certainly impending harm from the South Burley facility. (*see* Am. Compl. ¶¶3, 93-95, 104, 110, 116, 126-27, 149-50; 153-54, 172, 185). And based on their sworn affidavits, discussed further below, Plaintiffs have reasonable concerns about harmful pollution in their neighborhood.

7

Defendants argue that Plaintiffs are too focused on the Lincoln Park facility and that the South Burley facility will be a great improvement over the old site. (Dkt. 34). Defendants' contention that the South Burley facility will have a "best in class" pollution control system does not undermine Plaintiffs' Article III standing. First, Defendants do not and cannot argue that the South Burley and Lincoln Park facilities have *no* connection. Indeed Southside Recycling itself explains that "the [Term Sheet] with the City contemplates that the North Side facility will close, and *the operation will transition to the South Side*. These 'connections' are transparent to everyone…the critical pollution control equipment…will be moved so that these same effective controls will benefit the South Side facility." (Dkt. 57-1, Exh. 31, emphasis added).[7] Further, the Lincoln Park facility's Vice President of Operations will oversee management of the shredder at the new facility. (Dkt. 17-1, Exh. 13, p. 3). Finally, as Plaintiffs point out, Southside Recycling consultants performed emission modeling for the new facility based on testing from the Lincoln Park facility. (Dkt. 57 at 8-9, citing January 2020 Air Dispersion Modeling Report and supplement (Dkt. 37-1) and Recycling Permit Application (Dkt. 34-5, p.199)).

Second, Defendants do not argue that the South Burley facility will not pollute. Thus their arguments about expected emission levels go to the magnitude of the injury. But "[t]he magnitude, as distinct from the directness, of the injury is not

---

[7] As explained in the January 2020 Air Dispersion Modeling Report: "The GII shredder emission control system (including an emission capture hood, cyclone, roll-media particulate filter, RTO, quench, and packed tower scrubber) will be moved from GII [the Lincoln Park facility] to the proposed GIII [South Burley] facility and will be used to control emissions from the new GIII metal shredder." (Dkt. 37-1, Exh. 2, January 24, 2020 Air Dispersion Modeling Report, p.5).

critical to the concerns that underlie the requirement of standing." *Am. Bottom Conservancy v. U.S. Army Corps of Engineers*, 650 F.3d 652, 656 (7th Cir. 2011); *see also Brandt v. Vill. of Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010) (plaintiff can establish standing based on "actual or impending injury, no matter how small").

Demonstrating that Plaintiffs' injury is "certainly impending" are the sworn affidavits of Plaintiffs Rangel, Martinez and Facen. Defendants do not challenge these affidavits. Ms. Rangel states that she is a resident of the Eastside neighborhood and her family is Latinx/Hispanic heritage. (Dkt. 17-1, Exh. 22). She avers that both of her parents, who are in their 70s, suffer from medical conditions that are exacerbated by pollution and poor air quality, and her own asthma makes breathing difficult because of the poor air quality of the neighborhood. Ms. Rangel is a registered nurse and worked at Trinity Advocate Hospital, the closest hospital to her Eastside neighborhood. In her experience as a nurse at Trinity, respiratory emergencies and chronic respiratory exacerbations were among the most common health issues of her patients. She avers that as a health care professional, she is concerned that adding more pollution to a heavily polluted community will worsen the health of many residents who already suffer from serious respiratory issues. She is concerned that the increased air pollution will cause the many children with asthma to become sicker and more dependent on ventilation and intubation to breathe. These concerns are heightened by the Covid-19 pandemic and the virus's attack on lung functioning especially in her neighborhood which has experienced disproportionate rates of Covid-19 infections. In addition to the air quality issues, Ms. Rangel is concerned that

elderly residents of the community will become more isolated and confined to their homes because they are fearful of being exposed to increased pollution outdoors. She is also concerned that the South Burley facility will bring increased risk of hazmat or fire injuries that will burden the community's fire and emergency services, and that her family's single-family home will suffer decreased property values due to the facility's proximity to two public schools, a park and many residential homes.

Next, Mr. Martinez avers that he is a resident of the Eastside neighborhood and pastor of the Nehemiah Family Fellowship church. (Dkt. 17-1, Exh. 23). He states that most of the residents in his neighborhood are African American or of Latino/Hispanic heritage. Already-existing air quality issues in his neighborhood led to air monitors being installed at George Washington High School, which is directly east of the South Burley location. Mr. Martinez states that he is concerned that an increase of air pollution and particulate matter will exacerbate the existing health conditions of the most vulnerable in the community—senior citizens and children. And he explains that pollution has negatively impacted the neighborhood's property values. Finally, Ms. Facen avers that she is a resident of the Eastside neighborhood, she is multiracial, both Latina and Black, and she is a principal of a parochial school on the southeast side. (Dkt. 17-1, Exh. 24). As a principal, she has seen many of her students suffering from asthma and breathing related issues that can be exasperated by pollutants.

In addition, Professor Erdal states that she believes, based on her experience and the air quality study of the Lincoln Park facility, that the operation of a facility, like

the facility in Lincoln Park, could further diminish the air quality on the Southeast Side of Chicago and increase the public health risks to the community. (Dkt. 17-1, Exh. 18, ¶20). Similarly Professor Persky avers that the Southeast Side of Chicago already has the highest levels of several airborne toxic heavy metals in the State of Illinois, and that based on her experience and the same study, she believes that the operation of a facility, like the one in Lincoln Park, would negatively impact the health of the residents on the Southeast Side of Chicago. (Dkt. 17-1, Exh. 19 (Persky Aff.), ¶¶15-16).

The Seventh Circuit held in *Sierra Club v. Franklin Cty. Power of Illinois, LLC*, 546 F.3d 918 (7th Cir. 2008) that the "likely exposure to pollutants is certainly something more than an 'identifiable trifle' [for purposes of injury-in-fact] even if the ambient level of air quality does not exceed [certain national limits]." *Id*. at 925 (cleaned up). Further, Defendants' reference to the potential "environmental harms" (Dkt. 34 at 13) is not the relevant inquiry for purposes of Article III standing. As explained in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S. Ct. 693, 705 (2000), it "is not injury to the environment but injury to the plaintiff." In *Laidlaw*, affiants' sworn statements that "[defendant's] discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affect[ing] those affiants' recreational, aesthetic, and economic interests" established standing. *Id*. at 183-84. Plaintiffs' affidavits describe their reasonable concerns about pollutants and other negative effects of the South Burley facility in

their community, which they aver will directly affect their recreational and economic interests, and most significantly, their health.

The cases Defendants rely on are distinguishable. In *Clapper v. Amnesty Int'l USA*, plaintiffs challenged as unconstitutional surveillance authorized under § 1881a of the Foreign Intelligence Surveillance Act. 568 U.S. 398, 401, 133 S. Ct. 1138, 1142 (2013). The Supreme Court found Article III standing lacking where plaintiffs claimed that there was an "objectively reasonable likelihood that their communications will be acquired under § 1881a at some point in the future." *Id.* at 407. The alleged injury, the Court explained, was based on a "highly attenuated chain of possibilities" and so the threatened injury was not certainly impending. *Id.* at 410 (identifying five "highly speculative" fears of plaintiffs including whether the government would even invoke its authority under the challenged law and whether Article III judges would find the government's procedures constitutional). In *Lujan*, 504 U.S. 555, plaintiffs challenged a Secretary of the Interior rule interpreting the Endangered Species Act. The Court found that affidavits of two environmental group members contained no facts "showing how damage to the species will produce 'imminent' injury to [the affiants]" and the members' "'some day' intentions" to return to the foreign countries to try to see the endangered animals did "not support a finding of the 'actual or imminent' injury." *Id.* at 564. The Court also rejected plaintiff's general contention that they used the "ecosystem" without stating that they "use[d] the area affected by the challenged activity." *Id.* at 565-66.[8]

---

[8] Defendants also cite *Martin v. Emmanuel*, 2019 WL 4034506 (N.D. Ill. Aug. 27, 2019), where the court concluded that plaintiff lacked Article III standing for injunctive relief because

Here Plaintiffs state that their health and property will be directly harmed by the South Burley facility's imminent operation and emission of pollutants in their neighborhood. The South Burley facility has been constructed, several permits have been issued, and only one final permit remains to be issued before the facility's operation begins. Plaintiffs' injury is not based on a speculative chain of contingencies as in *Clapper*. Unlike in *Lujan,* Plaintiffs live and work two miles from and in the path of air pollution emissions from the South Burley facility. (Mot. ¶29).

### 2. *Casual Connection*

Defendants next argue that Plaintiffs have not shown a causal connection between their alleged injury and Defendants' conduct. However the City was a party to the Term Sheet, agreeing to "reasonably cooperate" to help transition the operation's move to the southeast side, and CDPH is the decision-maker for issuing the final recycling permit. The asserted imminent harm—pollution emissions in Plaintiffs' neighborhood—is traceable to Defendants' agreement in the Term Sheet and to (potentially) permitting the South Burley facility to operate. *See Franklin County*, 546 F.3d at 926 (traceability requirement met where defendants conceded that proposed plant will emit pollutants and did not point to any other polluting source).

To argue that the casual connection is lacking, Defendants rely on *Lujan*, 504 U.S. 555 and *Texas Indep. Producers & Royalty Owners Ass'n v. E.P.A.*, 410 F.3d 964 (7th Cir. 2005). In *Lujan*, the Court discussed the circumstance in which a plaintiff's

---

"[t]he homeless shelter system that she alleges is discriminatory does not imminently threaten her with an injury in fact: she has an apartment and the right to stay until her lease ends." *Id.* at *3. In contrast to *Martin,* Plaintiffs do not seek to prevent an injury from which they have protection.

alleged injury arises "from the government's allegedly unlawful regulation (or lack of regulation) of someone else" and standing depending "on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." 504 U.S. at 562 (citations and quotations omitted). The facility operator, Southside Recycling, is a third party here. But this is not a situation where "independent actors" will make "unfettered choices" and exercise broad discretion in a way the Court "cannot…predict." The remaining step in the process is predictable and undisputed—CDPH need only issue the final recycling permit in order for Southside Recycling to begin operations. If the permit is issued, Southside Recycling's counsel represented that operations would begin immediately. (Dkt. 57-1, Exh. 29, 1/5/21 Tr. 15:11-16:9, "the idea is once they do get the permit, then the next day, you know, or within days, they'll be able to start shredding material.").

In *Texas Indep. Producers*, the Natural Resources Defense Council (NRDC) challenged the U.S. EPA's issuance of a national general pollution permit. 410 F.3d at 967. The Seventh Circuit held that the NRDC did not establish the requisite causal connection for standing because the NRDC's affidavits did not identify "any specific construction sites authorized under the General Permit" or "any discharge from that project into the water body at issue." *Id*. at 972. Given the immense span of the bodies of water at issue, NRDC failed to show the affiants were in the "discharge zone of a polluter" (as opposed to being "so far downstream that their injuries cannot fairly be traced to that defendant"). *Id*. at 973 (cleaned up). By contrast, here Plaintiffs have

14

identified a specific polluting site and stated that they are in the zone of that pollution. Defendants do not dispute that Plaintiffs are in the path of the new facility's projected emissions.[9]

*Am. Bottom Conservancy*, 650 F.3d 652, supports Plaintiffs' standing. In that case plaintiff brought suit to invalidate the Army Corps of Engineers permit which allowed defendant disposal company to destroy wetlands. When plaintiff filed suit, the company had a separate permit pending before the Illinois Environmental Protection Agency (IEPA) to build a new landfill. The Seventh Circuit explained that to have standing, plaintiff had to show "that the relief he seeks will if granted avert or mitigate or compensate him for an injury…caused or likely to be caused by the defendant." *Id*. at 656. There the injury was denying a person who derives pleasure from watching wildlife the opportunity to watch it. *Id*. The Seventh Circuit disagreed with the lower court that found affiants' anxiety about the planned (but not yet existent) landfill did not support standing. The Seventh Circuit explained that although it was not certain that the company would obtain the IEPA permit to build the new landfill, if plaintiff could "knock[] out" the Corps of Engineers permit, "there

---

[9] Defendants' contention that Plaintiffs have not explained "how the operative regulatory structure does not protect their interests" (Dkt. 34 at 6) is not accurate. Plaintiffs argue that Southside Recycling has and will receive the required permits because of the Term Sheet that was entered into outside of normal processes. Similarly Defendants' argument that Plaintiffs have not explained how the "City's complex Rules…will lead to the environmental harms they claim will follow" (Dkt. 34 at 12-13) distracts from the relevant inquiry--"injury to the plaintiff." *Laidlaw*, 528 U.S. at 181. Plaintiffs do not challenge the rules. In short, while Defendants focus on the regulations and review process, Plaintiffs seek to enjoin Defendants from issuing the final permit, which they allege will be the result of an "unusual" agreement by the City to help facilitate the move of the facility to the southeast side and cause them injury.

will be no North Milam landfill. And so a judgment in the plaintiff's favor in the present lawsuit would eliminate a probable injury from the landfill. No more is necessary to establish standing." *Id.* at 658. Similarly here, the relief Plaintiffs seek— preventing the issuance of the final permit—will avert injury from the new facility.[10]

### 3. *Redressability*

The redressability element of standing is met "when a judicial decision in the plaintiff's favor would redress th[e] injury." *Brandt*, 612 F.3d at 649. The inquiry focuses on "the relief requested." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 502 (7th Cir. 2005).

Defendants argue that Plaintiffs have not identified "how the pending permit application will harm Plaintiffs" such that there is no harm redressable by the Court. But Plaintiffs are not challenging the application. A decision in Plaintiffs' favor— blocking the final permit—would relieve their claimed injury. Plaintiffs do not need to grapple with the details about the new facility's potential emissions and the Court need not assess how beneficial or not the new facility will be. *See Franklin County*, 546 F.3d at 927-28 (plaintiff "need not show that a favorable decision will relieve her every injury."); *Am. Bottom Conservancy*, 650 F.3d 652 (court's ruling on any bad effects of the landfill would be ruling on the merits, not on likelihood of injury caused by landfill). Plaintiffs' injury can be redressed even though the final permit has not

---

[10] Defendants' and Southside Recycling's insistence on the benefits of the new facility does not factor into this standing analysis. In *Am. Bottom Conservancy,* the Court discussed the possibility that "the permit granted by the Corps of Engineers is actually a boon to the environment", but found that was a question about "the merits of the Conservancy's challenge to the Corps; it does not detract from the injuries to the Conservancy's current members." 650 F.3d at 659–60.

yet issued. *See Franklin County*, 546 F.3d at 927-28; *Massachusetts v. E.P.A.*, 549 U.S. 497, 526, 127 S. Ct. 1438, 1458, 167 L. Ed. 2d 248 (2007) (redressability requirement met where risk of harm "would be reduced to some extent if petitioners received the relief they seek.").

### B. Ripeness

Standing and ripeness "require related but distinct inquiries: 'Whereas ripeness is concerned with *when* an action may be brought, standing focuses on *who* may bring a ripe action.'" *Indiana Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007) (citation omitted). Ripeness is based on "the Constitution's case-or-controversy requirements as well as discretionary prudential considerations." *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011). Ripeness issues arise "when a case involves uncertain or contingent events that may not occur as anticipated, or not occur at all." *Id.*

Defendants maintain that this case is not ripe because the "parameters" of the South Burley facility's operations are "entirely speculative." (Dkt. 34 at 14). First, however, this argument conflicts with Defendants' insistence that the parameters of the new facility's future operations are transparent, detailed, and precise. (*See id.* at 6, "the operations of the new facility, including its technologies to mitigate environmental discharge, are detailed in a nearly 300-page permit application and in other documents submitted at other levels of the regulatory process."). In other words, Defendants challenge Plaintiffs' injury for standing purposes by arguing that Plaintiffs have not engaged with the details of the forthcoming operation, and at the

same time, Defendants argue this case is not ripe for judicial resolution because the nature of that operation is too speculative.

In *Franklin County*, the Seventh Circuit explained that the threatened injury satisfied standing requirements and because the company had actually begun construction of the plant, practically it "[made] sense for Sierra Club to challenge the validity of the Company's permit now, rather than waiting until the plant is operational." 546 F.3d at 926. *See also Triple G Landfills, Inc. v. Bd. of Comm'rs of Fountain Cty., Ind.*, 977 F.2d 287, 290 (7th Cir. 1992) (contingency that company's permit would be denied "not sufficient to defeat ripeness."). Here, the South Burley facility is constructed, it only awaits the final permit to begin operations. (1/5/21 Tr. at pp. 15-16).

*Jones v. Griffith*, 870 F.2d 1363 (7th Cir. 1989), relied on by Defendants, bears no resemblance to this case. *Jones* addressed a special procedure for medical malpractice cases in Indiana and plaintiff improperly asked the court "to give legal instructions to an [Indiana] advisory panel mulling over a dispute that may never be the subject of a lawsuit." *Id.* at 1367. The present case is not one that lies "merely in the future" *id.* at 1366, or where "the problem [Plaintiffs] present will ever need solving is too speculative." *Texas v. United States*, 523 U.S. 296, 296, 118 S. Ct. 1257, 1258 (1998). Moreover, the Court is mindful of the Supreme Court's "recent reaffirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'" *Susan B. Anthony List*, 573 U.S. at 167 (where Article III injury sufficiently alleged, declining to consider prudential ripeness

concerns) (citations omitted); *see also Cassell v. Snyders*, 458 F. Supp. 3d 981, 992 (N.D. Ill. 2020), aff'd, 2021 WL 852227 (7th Cir. Mar. 8, 2021). The Court finds the case as presented is ripe.

## C. Likelihood of Success on the Merits

A party moving for a preliminary injunction must show a likelihood of succeeding on the merits. *See Illinois Republican Party,* 973 F.3d at 762. This is "a significant burden," though "at such a preliminary stage, the applicant need not show that it definitely will win the case." *Id.* at 763. "A 'strong' showing thus does not mean proof by a preponderance…[b]ut it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.*

Plaintiffs allege violations of the Title VI of the Civil Rights Act, federal and state Equal Protection Clause, and nuisance law. In their response brief, Defendants' raise several challenges to Plaintiffs' Title VI discrimination claim (Count I). Plaintiffs do not respond to these arguments and focus only on the Equal Protection and nuisance claims. (*see* Dkt. 17 at 18; Dkt. 57 at 13-23, "Plaintiffs have demonstrated some likelihood of succeeding on the merits of the Equal Protection and prospective nuisance claims."). For purposes of the present motion, Plaintiffs have waived any argument that they are likely to succeed on their Title VI discrimination claim. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("The obligation to raise the relevant arguments rests squarely with the parties."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (waiver applies "where a party fails to develop arguments related to a discrete issue."); *MBM Holdings LLC v. City of*

19

*Glendale*, 2021 WL 423760, at *2 (7th Cir. Feb. 8, 2021) ("It is the responsibility of the litigants to raise coherent legal claims, produce factual support, and develop reasoned arguments supported by citation to legal authority."). In any event, because Plaintiffs have not shown a likelihood of success on their equal protection claim, as discussed below, they also have not shown a likelihood of success on their Title VI claim. *See Quinn v. Bd. of Educ. of the City of Chicago*, 234 F. Supp. 3d 922, 934 (N.D. Ill. 2017), aff'd sub nom. *Quinn v. Illinois*, 887 F.3d 322 (7th Cir. 2018) (showing of intentional discrimination required for both equal protection and Title VI claims).

**1. Equal Protection Claims**

"To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were *motivated by* a discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001) (emphasis added). "Proof of racially discriminatory intent or purpose is required." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555 (1977). "Discriminatory purpose means more than simple knowledge that a particular outcome is the likely consequence of an action; rather, discriminatory purpose requires a defendant to have selected 'a particular course of action at least in part 'because of'...its adverse effects upon an identifiable group." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017).[11]

---

[11] Plaintiffs' counsel stated at the March 8th oral argument that they are not bringing a disparate impact claim. (Mar. 8 Tr. (Dkt. 63) at p. 28). Indeed "the Supreme Court's equal-protection jurisprudence does not recognize a claim for disparate impact." *Adams v. City of Indianapolis*, 742 F.3d 720, 726 (7th Cir. 2014).

"Discriminatory purpose [] implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996); *see also Bond v. Atkinson*, 728 F.3d 690, 693 (7th Cir. 2013) (plaintiff must show defendants "adopted that policy *because of, not in spite of or with indifference to*, its effect on [the identifiable group]") (emphasis added).

To try to show discriminatory intent, Plaintiffs argue that: (1) "[a] reasonable, and the only objectively rational, explanation for the relocation of a serial polluter from a majority white area to a minority area is the furtherance of the City of Chicago's pattern of burdening black and brown residents of the Southeast Side with disproportionate pollution"; (2) the City's Air Quality Report shows that minority communities bear the brunt of pollution in Chicago; (3) the September 10th Term Sheet was "unusual"; and (4) the City crafted rules to avoid evaluating PM2.5, the more harmful pollutant. (Dkt. 17 at 16-17; Dkt. 57 at 14-20).

Plaintiffs rely on *Arlington Heights*, 429 U.S. at 265 and the proposition that "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id*. at 266. The historical pattern in Chicago of Black and Latinx communities being exposed to greater levels of pollution is undisputed and all the more alarming during the current pandemic. The City itself illuminated the problem in its 2020 Air Quality and Health Report when it stated:

> In Chicago, with its history of segregation and disinvestment in Black and Latinx communities, the differences between neighborhoods can be stark…[and] the areas of greatest concern are primarily located on the South and West Sides of the city. In particular, parts of the city bisected by major highways with high concentrations of industry are over-burdened, experiencing high levels of both pollution and vulnerability.

(Dkt. 17-1, Exh. 17, 2020 Air Quality Report at 4-5). It is not disputed that the South Burley facility falls into an area already disproportionately impacted by harmful pollution. *Id*. p.7. It is also not disputed that Lincoln Park is 84.6% white, while 93.5% of the area surrounding the South Burley location is Black and Latino. (Mot. ¶18).

The Supreme Court explained in *Arlington Heights*, however, that while "[d]isproportionate impact is not irrelevant, … it is not the sole touchstone of an invidious racial discrimination…[p]roof of racially *discriminatory intent* or purpose is required to show a violation of the Equal Protection Clause." 429 U.S. at 265 (cleaned up) (emphasis added). According to the law, Plaintiffs must show that Defendants "selected 'a particular course of action at least in part 'because of' … its adverse effects upon an identifiable group." *Alston*, 853 F.3d at 907. *See also Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 274, 99 S. Ct. 2282, 2293 (1979) ("purposeful discrimination is 'the condition that offends the Constitution.'") (citation omitted).

To determine whether discriminatory intent was a motivating factor the Court considers the historical background of and events leading to the challenged decision, departures from normal procedure, and legislative or administrative history. *Arlington Heights*, 429 U.S. at 267-68. In *Arlington Heights,* the Village's denial of a rezoning request did "arguably bear more heavily on racial minorities" but there was "little about the sequence of events leading up to the decision that would spark

22

suspicion." *Id.* at 269. The area had been zoned for single-family homes since 1959, the rezoning request progressed according to the usual procedures and the process included additional hearings for respondents. In addition, statements by defendant members at the hearings focused on zoning. Ultimately respondents failed to prove that a "discriminatory purpose was a motivating factor in the Village's decision." *Id.* at 270-71. Similarly here, the Plaintiffs have not shown a discriminatory purpose behind the move of the facility from Lincoln Park to South Burley.

The South Burley site is located on an already industrial-zoned site where RMG has operated a recycling plant for about two decades. (Dkt. 57-1, Exh. 31). Southside Recycling needed to secure a zoning variance, but the Court has reviewed the entirety of the zoning board hearing and there is no evidence of discriminatory intent during that hearing. Plaintiffs do not assert otherwise. Plaintiffs point to the campaign contributions by people associated with General Iron to City officials over the years but do not cite evidence of racial discriminatory intent related to these contributions. (Mot. ¶11). And the record reflects that the CDPH permitting process, not yet concluded, has been detailed and exhaustive.[12]

As to the Term Sheet, Defendants have not provided any examples of other similar term sheets the City has entered, and confirmed at oral argument that it was aware of no other examples. (Mar. 8 Tr. at p. 23). But Plaintiffs' characterization that in the Term Sheet the "City agreed, in advance, to approve all the permits and licenses

---

[12] Plaintiffs claim that the September 2020 CDPH pollution permit was issued without prior notice (Mot. ¶27) but cite no authority requiring public notice prior to the pollution permit being issued. The Court does not consider this a departure from regular procedure.

required to move the polluting scrap metal facility to the Southeast Side" (Dkt. 17 at 2) is not accurate. The City agreed to "reasonably cooperate with RMG in achieving the efficient, expeditious transition of the Business to the Southside Properties, including reasonable assistance with processing and review of license and permit applications, and scheduling of public hearings." (Term Sheet, ¶5). That is admittedly unusual. But the City also warned that it will "enforce its ordinances, rules, regulations, licenses, permits and policies as necessary to protect the public health and safety and welfare, applying such enforcement neutrally and consistently to General Iron, RMG and other metal recycling facilities in the City." (*Id.* ¶7). Finally, the City allowed General Iron and RMG to retain their *current* licenses on the northside until the cessation date, subject to the companies' compliance with all City laws and rules.[13] (*Id.*).

Plaintiffs argue that ZBA approved the special use and zoning variance "consistent with the City fulfilling the Term Sheet" (Mot. ¶26). That is not accurate since the ZBA approval in April 2019 was five months *before* the City entered into the Term Sheet. While it is true that the Term Sheet is unusual, potentially borne out of a desire to make the area surrounding the Lincoln Yards development even more desirable, it does not show that a racially discriminatory purpose motivated the decision to relocate the facility to the southeast side.

Plaintiffs also argue that the City failed to address the more harmful PM2.5 pollutant (as compared to PM10) in the CDPH Rules For Large Recycling Facilities,

---

[13] Plaintiffs do not assert that this is evidence of a departure from regular procedure, but if it was, it is not evidence of race discrimination.

promulgated June 5, 2020 ("Large Recycling Rules"). (Dkt. 34-2, Exh. B). As Professor Persky explained in her affidavit, fine particle matter (PM) is a mixture of air pollutants monitored by the EPA that pose health risks particularly to children, the elderly and individuals with existing lung issues such as asthma. (Persky Aff. ¶¶6-8).[14] In its Air Quality and Health Report issued in 2020, the City focused on PM2.5 and found that "PM2.5 pollution, which can penetrate deep into the lungs, is particularly damaging". (Dkt. 17-1, Exh. 17, 2020 Air Quality Report, p.3). Yet, when the City developed its Large Recycling Rules in 2020, it only required reporting on PM10. (Large Recycling Rules, §4.7.7.). Plaintiffs seems to suggest the City engaged in nefarious conduct by requiring only PM10 for a permit, after studying PM2.5 in the Air Quality Report. But the question for this Court is whether there was *discriminatory intent based on race* in this case. There is no basis in the City's promulgation of the Large Recycling Rules—including setting the standard at PM10—for the Court to find that Plaintiffs are likely to succeed on an Equal Protection claim in this case.

Plaintiffs have not cited any evidence that Defendants decided to help facilitate the move of the recycling operation to the Southeast side "at least in part '*because of*'...its adverse effects" on minority residents in the 10th Ward. *See Alston*, 853 F.3d at 907 (emphasis added). To the contrary, Defendants maintain and Plaintiffs do not dispute, that the Large Recycling Rules "were finalized after substantial input by the

---

[14] The EPA documents attached to Plaintiffs' reply brief state that particle matter (PM) is also called particle pollution, and PM2.5 is "fine particles" and PM10 is "course particles." PM generally is "hazardous to human health" but PM2.5 "pose[s] the greatest risk to health." (Dkt. 57-1, Exhs. 36, 37).

public, including prominent members of the environmental community including NRDC, Southeast Environmental Task Force, Southeast Side Coalition to Ban Petcoke, and the Little Village Environmental Justice Organization." (Dkt. 34 at 8). Plaintiffs also do not dispute Southside Recycling's representation that the rules "include perhaps the most strict air monitoring requirements of any shredding facility in the country." (Dkt. 37 at 3). Moreover while the Large Recycling Rules focus on PM10, they expressly state that CDPH "may set forth different or additional [Reportable Action Levels] in the permit for wind speeds, *PM2.5*, VOCs, and other pollutants based on the information contained in the application, the Facility's compliance history, the occurrence of dust nuisance and health complaints and/or other factors Guidelines." (Large Recycling Rules, §4.7.7.7, emphasis added).

The cases cited by Plaintiffs do not support a finding of discriminatory intent in this case. *Laramore v. Illinois Sports Facilities Auth.*, 722 F. Supp. 443 (N.D. Ill. 1989) addressed the site for the Chicago White Sox stadium. It was decided on a motion to dismiss, requiring only that plaintiff sufficiently allege discriminatory intent, and contained procedural irregularities that do not exist here. *Id*. at 450. While Plaintiffs disagree with the outcomes of the zoning and permitting processes to date, they do not argue that the process has lacked study, public hearing, or opportunity for review of the evidence.[15]

---

[15] Generally arguing that the City has engaged in a pattern of discriminatory land use actions (Dkt. 17 at 15, citing *Gautreaux v. Chicago Housing Authority*, 296 F. Supp. 907 (N.D. Ill. 1969)), does not demonstrate discriminatory intent in this case. Further the overt and particularized racially discriminatory actions found by the court in *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 851 F. Supp. 905, 933 (N.D. Ill. 1994), affirmed in part and reversed in part, 111 F.3d 528 (7th Cir. 1997) (finding defendant school board caused

Because the same analysis applies to equal protection claims under both the Federal and State Constitutions (*City of Chicago v. Alexander,* 2015 IL App (1st) 122858-B, ¶ 50, 46 N.E.3d 1207, 1224, aff'd, 2017 IL 120350, ¶ 50, 89 N.E.3d 707), the above analysis applies equally to Plaintiffs' Illinois equal protection claim. Therefore Plaintiffs have not shown a likelihood of success on Counts II and III.

### 2. State Law Nuisance Claims

Plaintiffs bring claims for public and private nuisance under Illinois law. They argue that they are likely to succeed "in showing that the toxic emissions that would be generated by General Iron/RMG, including 'fugitive dust' containing dangerous metal particles, volatile organic matter, and other air pollutants, will create a public and private nuisance." (Dkt. 17 at 18).

"A private nuisance is a substantial invasion of another's interest in the use and enjoyment of his or her land. The invasion must be: substantial, either intentional or negligent, and unreasonable." *In re Chicago Flood Litig.*, 176 Ill. 2d 179, 204, 680 N.E.2d 265, 277 (1997). "A public nuisance is something that negatively affects the public's health, safety, or morals, or causes substantial annoyance, inconvenience, or injury to the public." *Helping Others Maintain Env't Standards v. Bos*, 406 Ill. App. 3d 669, 689, 941 N.E.2d 347, 366 (2010). "Courts of equity have traditionally been

---

unlawful racial segregation through acts and omissions over long period of time including, but not limited to: (1) tracking students by race into programs; (2) drawing school attendance boundaries to create segregation; (3) failing to design desegregation plan although ordered to do so; (4) providing inequitable transportation based upon race; (5) placing facilities to burden minority students; and (6) perpetuating discriminatory make-up of Board of Education), do not support a finding of an Equal Protection violation based on the City's conduct here.

reluctant to enjoin an industrial operation unless it is clearly and satisfactorily proven to be a nuisance. If the right to relief is doubtful, either as to the law or under the facts presented, equitable relief will not usually be granted." *City of Chicago v. Commonwealth Edison Co.*, 24 Ill. App. 3d 624, 632, 321 N.E.2d 412, 418 (1974). *Harrison v. Indiana Auto Shredders Co.*, 528 F.2d 1107, 1125 (7th Cir. 1975) (even with the "existence of a common nuisance," "the drastic remedy of closing down the operation without endeavoring to launder its objectionable features would be impermissible under our law").

Plaintiffs' nuisance claims are similar to the general claims found to be insufficient in *Vill. of Willow Springs v. Vill. of Lemont*, 2016 IL App (1st) 152670, 70 N.E.3d 210. There, plaintiff village sought to enjoin the neighboring village from developing property for heavy industrial use. The Illinois appellate court affirmed the dismissal of the complaint because the allegations supporting the public nuisance claim were too generic. *Id*. ¶ 51. While a plaintiff can seek to enjoin a "prospective nuisance", plaintiff's allegations had to amount to more than speculation. The court explained:

> Unless the activity complained of is a *per se* nuisance or the existence of a nuisance has already been legally established, it is only in *extreme cases* that a court of equity will take jurisdiction to abate a nuisance by injunction. To succeed on such a claim, a plaintiff must demonstrate that it is 'highly probable' that the anticipated activity will lead to a nuisance; 'if the possibility is merely uncertain or contingent [the plaintiff] may be left to his remedy after the nuisance has occurred.'

*Id*. ¶ 48 (emphasis in original) (cleaned up). Plaintiffs do not argue that the South Burley facility is a *per se* nuisance or that the nuisance has already been legally

28

established. Accordingly Plaintiffs must show that this is an *extreme case* in which it is *highly probable* that the South Burley operation will lead to a nuisance. Plaintiffs have not done so.

In *Vill. of Willow Springs,* the allegations that were "exceedingly generic" were that "property values will diminish," that "tax revenue will be lost," and that "roads will be more congested". *Id.* ¶ 51. Thus Willow Springs "alleged, at most, a possibility of future harm that is dependent on the specific ways in which the property may be used." *Id.* Plaintiffs' claims here that air pollution, toxic emissions, and smoke will create "significant risks to health, safety, and welfare", disturbance to "Plaintiffs' right to property" and "interfere[nce] with Plaintiffs' use and enjoyment of their properties" are similarly generic. (Dkt. 17 at 18-19; Dkt. 57 at 20-21).

Plaintiffs rely on *Whipple v. Vill. of N. Utica*, 2017 IL App (3d) 150547, 79 N.E.3d 667 in which plaintiffs sufficiently stated a prospective nuisance claim based on a not-yet-operational silica sand mine. The appellate court reiterated the requirement that it be "highly probable" that the challenged activity lead to a nuisance. *Id.* ¶ 47. The court found some of the allegations too speculative: claims of "harm to field tile, flooding, and well contamination", unsupported by documents "demonstrating a direct harm." *Id.* ¶ 49. By contrast, allegations sufficiently supporting the nuisance claim were:

> (1) that there will be continuous lights and noise of up to 133 decibels from blasting, drilling, and rock crushing equipment, (2) that 146 trailer loads of sand exiting the operation each day will increase traffic on rural roads, (3) that the operation will discharge up to 1.25 million gallons of effluent per day into the Pecumsaugan Creek, and (4) that the mining

29

operation will add particulate silica dust to the air around the mining site.

*Id.* ¶ 50. Plaintiffs' motion does not contain the same level of specifics as in *Whipple*. And unlike in *Whipple,* the City has not yet issued final approval for the South Burley facility's operations. *See id.* ¶ 52 ("development *and operation* of a silica sand mine *has already been approved by the municipality*.") (emphasis added). Moreover that case addressed a motion to dismiss. Here Plaintiffs must do more than allege nuisance—they must demonstrate how they will "prove the key elements of [their] case." *Illinois Republican Party,* 973 F.3d at 763. *See also Fox v. Riverview Realty Partners*, 2013 WL 1966382, at *7 (N.D. Ill. May 10, 2013) (motion to dismiss and motion for preliminary injunction standards different).

In *Nickels v. Burnett,* 343 Ill. App. 3d 654, 798 N.E.2d 817 (2003), the Illinois appellate court affirmed the trial court's enjoining construction of a hog confinement facility. In response to plaintiffs' expert affidavits and scholarly articles discussing the likely harms from the hog facility, defendants "neither denied the allegations of plaintiffs' claims nor attached any counteraffidavits to challenge plaintiffs' assertions." *Id.* at 662. By contrast Defendants and Southside Recycling strenuously deny Plaintiffs' allegations that the forthcoming operation will create a nuisance, and point to the IEPA and CDPH processes and the permit application detailing how emissions, dust and noise will be controlled at the South Burley facility and monitored by regulating agencies.

Plaintiffs' reliance on "past General Iron Emissions" (Dkt. 57 at 21) does not show a high probability that the South Burley facility will be a nuisance in the southeast

side neighborhood. And their contention that the "prospective nuisance is []
reasonably likely to occur" (Dkt. 57 at 22) does not meet the high standard. *See
Nickels*, 343 Ill. App. 3d at 663 (it must be "highly probable" the activity will lead to
a nuisance and the harm must be "highly likely"). In sum Plaintiffs have not shown
a likelihood of success on their state law nuisance claims.

### D. Summary

If a plaintiff fails to meet any of the threshold requirements for a preliminary
injunction including likelihood of success on the merits, the court "*must deny* the
injunction." *GEFT Outdoors, LLC*, 922 F.3d at 364 (emphasis added). *See Orr v.
Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) ("a preliminary injunction is an exercise of
a very far-reaching power, never to be indulged [] except in a case clearly demanding
it.") (cleaned up). Because Plaintiffs failed to show a likelihood of success on their
claims, the Court does not proceed to analyze the additional "threshold" or
"balancing" phase elements. "[S]ince [plaintiff] has no likelihood of success on the
merits of this claim, there was no need for the district court to conduct further
analysis of the 'threshold phase' for preliminary injunctive relief, or to move to the
'balancing phase.'" *GEFT Outdoors, LLC,* 922 F.3d at 367–68.

The Court shares Plaintiffs' and the City's concerns, as expressed in the 2020 Air
Quality and Health Report, regarding the disproportionate burden borne by Black
and Latinx communities from pollution, particularly during the pandemic. But
considering existing precedent, Plaintiffs have not met their burden to show how they
will prove the key elements of their case.

## CONCLUSION

For the stated reasons, Plaintiffs' motion for preliminary injunction [17] is denied.


E N T E R:

Dated: April 14, 2021

_____
MARY M. ROWLAND
United States District Judge

32